### The COUNCIL OF the CITY OF PHILADELPHIA

v.

### Honorable John F. STREET, Appellant.

Commonwealth Court of Pennsylvania.

Argued June 9, 2004.
Decided Aug. 25, 2004.

Arlin M. Adams, Philadelphia, for appellant.

Robert C. Daniels, Philadelphia, for appellee.

BEFORE: McGINLEY, Judge, and SMITH–RIBNER, Judge, and FRIEDMAN, Judge, and LEADBETTER, Judge, and COHN, Judge.

OPINION BY Judge COHN.

The Mayor of Philadelphia, the Honorable John F. Street (Mayor) appeals from the order of the Court of Common Pleas of Philadelphia County (common pleas),

granting the motion for peremptory judgment filed by the Council of the City of Philadelphia (Council), and denying the Mayor's motion for summary judgment. On appeal, we are asked to decide whether common pleas erred in holding that it is within the power of the Council to enlarge the class of residents of the City of Philadelphia (City) eligible for no-cost refuse collection service as provided by Bill No. 010659 (Bill).

The parties stipulated to undisputed facts. On November 15, 2001, members of Council introduced a proposed ordinance to amend Chapter 10–700 of The Philadelphia Code to establish eligibility for no-cost municipal collection of refuse, recycling and bulk items for residents of buildings with six or less occupied units, and residents of all condominiums and cooperatives regardless of size. Prior to enactment of the Bill, pursuant to regulation, no-cost refuse collection had been provided only to residential premises (including condominiums and cooperatives) which contained no more than six dwelling units and which generated no more than six (6) 32 gallon receptacles of trash per week. The Bill[1] further provided that such legislation was to take effect not later than sixty (60) days from the date of enactment or the beginning of the 2003 Fiscal Year, which-

ever came first. Council passed the Bill on June 6, 2002 by unanimous vote and submitted it to the Mayor for his approval.

On September 12, 2002, the Mayor returned the Bill to Council without his signature and without exercising his veto power. He included with the Bill a letter addressed to Council in which he recognized that he was allowing the Bill to become law without his signature, and advising Council that he would not enforce it. In the letter, he explained that the City Solicitor had advised him that the Bill's provisions went beyond Council's power of legislation under the City's Home Rule Charter, and were, therefore, unenforceable. The Mayor stated that Council does not have the power to direct how a City department will carry out its activities and may not require City administration to spend funds on a particular activity. He also stated that Council's passage of the Bill would intrude upon the powers vested in the Executive Branch of City government.

Subsequently, on January 9, 2003, Council filed an action in mandamus in common pleas, seeking to compel the Mayor to implement and enforce the ordinance. By agreement of the parties, the matter was submitted with stipulated facts, and on

1.  Bill No. 010659 reads:
    Amending Chapter 10–700 of The Philadelphia Code, concerning Refuse and Littering by adding a new Section entitled "Residential Eligibility for Municipal Collection," all under certain terms and conditions.
    THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:
    Section 1. Chapter 10–700 of The Philadelphia Code is hereby amended to read as follows:
    § 10–701. Definitions.
    In this Chapter the following definitions apply:
    * * *
    § 10–717.1. *Residential Eligibility for Municipal Collection. Residential dwellings of*

the following types shall be eligible for regular City refuse, recycling and bulk item collection at no cost:
(a) buildings with six or less occupied units;
(b) condominium (as defined in 68 Pa.C.S.A. § 3103) and
(c) cooperatives (as defined in 68 Pa.C.S.A. § 4103).
Section 2. This Ordinance shall take effect after the promulgation of regulations by the Streets Department, but no later than sixty (60) days from the date of enactment or the beginning of the 2003 Fiscal Year, whichever is earlier.
(Emphasis in original.)

cross-motions for dispositive relief: Council filed a motion for peremptory judgment and the Mayor a motion for summary judgment. *See* Stipulation, R.R. 39a–40a. After oral argument on the motions, common pleas, by order dated May 28, 2003, granted Council's motion for peremptory judgment and denied the Mayor's motion for summary judgment. Judge Carrafiello found that the Bill "did not command a specific expenditure of funds," and was "well within the legislative powers of the City Council under the Charter." (Slip opinion at 3). The Mayor filed an appeal with this Court.

■ Peremptory judgment in a mandamus action may be entered only where no genuine issue of material fact exists, and the case is free and clear from doubt. *Forward Township Sanitary Sewage Authority v. Township of Forward*, 654 A.2d 170 (Pa.Cmwlth.1995). Here, there are no disputed facts, and because the underlying issue is a question of law, this Court has plenary review of common pleas' order. *Hess v. Gebhard & Company*, 570 Pa. 148, 162, 808 A.2d 912, 920 (2002).

■ "Mandamus is an extraordinary writ and is a remedy used to compel performance of a ministerial act or a mandatory duty." *Borough of Plum v. Tresco*, 146 Pa.Cmwlth. 639, 606 A.2d 951, 953 (1992). A ministerial act is defined as "one which a public officer is required to perform upon a given state of facts in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning the propriety or impropriety of the act to be performed." *Flaherty v. City of Pittsburgh*, 100 Pa.Cmwlth. 508, 515 A.2d 91, 92 (1986) (quoting 17 McQuillen, *Municipal Corporations* § 51.19 (3rd ed.1982)). In

order to obtain a writ of mandamus, the appellee must demonstrate: (1) a clear legal right for the performance of the ministerial act or mandatory duty, (2) a corresponding duty in the appellant to perform the ministerial act or mandatory duty, and (3) the absence of any other appropriate or adequate remedy. *Equitable Gas Company v. City of Pittsburgh*, 507 Pa. 53, 57–58, 488 A.2d 270, 272 (1985); *Advantage Development, Inc. v. Board of Supervisors of Jackson Township*, 743 A.2d 1008, 1011 (Pa.Cmwlth.2000). In considering the Mayor's arguments on appeal, we keep these principles in mind.

■ In order to be successful, Council must first demonstrate that it has the legal right to enact the Bill and compel the Mayor to enforce it. The Mayor and Amicus Curiae, The Committee of Seventy,[2] present well briefed arguments in support of their contention that "Council does not have the power to direct the Mayor to provide a new and expensive service to a select group of constituents." (Mayor's Reply Brief, p. 1.) First, they argue that Council's power regarding the expenditure of appropriated funds is expressly limited by the City's Home Rule Charter (Charter). Second, they claim that the Charter expressly vests in the Mayor, alone, the power and responsibility to protect the City's finances, to impound funds, and to direct that expenditures not be made where the Mayor does not deem them necessary. Third, they claim that the structure and history of the Charter supports a "strong Mayor," who has the power to determine fiscal and administrative policy and gives Council important, but expressly limited, powers with respect to the operations of government. These con-

---

**2.** The Committee of Seventy is a non-partisan and non-profit association of concerned citizens, founded in 1904, "dedicated to research, education and concerted action to ensure good government in Philadelphia." (Amicus Brief at 3.)

tentions are based on the underlying premise that Council's actions amount to an "appropriations" action rather than a legislative directive. Contrary to this position, Council views its action as a valid exercise of its general legislative powers, its police powers, and valid under two specific provisions of the Charter, and not as a budgeting or appropriations action. We must, therefore, determine whether the ordinance was an invalid appropriations action or valid legislative action.

■ Because the term "appropriation" is not defined in the Charter, we look to its common definition. We have noted that "appropriation" is commonly defined as "money that is set aside by formal action for a specific use." *Concerned Taxpayers of Clearfield County v. Clearfield County,* 764 A.2d 656, 659 (Pa.Cmwlth.2000) (quoting Webster's Ninth New Collegiate Dictionary 98 (1989)). When used in a legislative sense, the term "appropriation" means "a designation of money raised by taxation to be withdrawn from the public treasury for a specifically designated purpose." *Shapp v. Sloan,* 480 Pa. 449, 466, 391 A.2d 595, 603 (1978), *appeal dismissed sub nom. Thornburgh v. Casey,* 440 U.S. 942, 99 S.Ct. 1415, 59 L.Ed.2d 630 (1979) (quoting *Commonwealth v. Perkins,* 342 Pa. 529, 532, 21 A.2d 45, 48 (1941), *affirmed per curiam,* 314 U.S. 586, 62 S.Ct. 484, 86 L.Ed. 473 (1942)). It has further been defined as:

The act by which the legislative department of government designates a particular fund, or sets apart a specified portion of the public revenue or of the money in the public treasury, to be applied to some general object of governmental expenditure, or to some individual purchase or expense....

The legislative designation of a certain amount of money as being set aside,

allotted, or assigned for a specific purpose....

*Common Cause of Pennsylvania v. Commonwealth,* 668 A.2d 190, 205 (Pa.Cmwlth. 1995) (quoting Black's Law Dictionary 102 (6th ed.1990)), *affirmed,* 544 Pa. 512, 677 A.2d 1206 (1996). An "appropriation bill" is defined as "[a] measure before a legislative body authorizing the expenditure of public moneys and *stipulating the amount, manner, and purpose of the various items of expenditure ...." Id.* (quoting Black's Law Dictionary 102 (6th ed.1990)) (emphasis added).

Council did not specifically engage in a type or form of appropriation here; it did not set funds aside by formal action or withdraw money from the public treasury for a specifically designated purpose. As succinctly stated by common pleas:

The Bill did not command a specific expenditure of funds, but rather required that a specific class of tax-paying residents receive the same service as other[s] similarly situated, that of no-cost refuse collection.

(Trial Court op., p. 3.) Council included no details in the Bill as to *how* the service must be provided. The Bill leaves the decisions regarding implementation of the Bill to the Mayor and his administration; specifically, they are to decide whether additional employees and/or equipment are needed to accomplish the task, or, whether to have trash pick-up performed by private contractors. *See* Charter, Chapter 2, § 2–300, annotation 2 (posing the question "[h]ow many persons are to be employed, how many automobiles are to be purchased, and similar questions of administrative policy will be determined within overall appropriation limits by the executive branch and not the Council.") The plain words in the Bill do not specifically affect or alter the Mayor's role in administering the *manner* in which to carry out

the service for City residents. Rather, those words only authorize a municipal service, already provided to some residents, to be provided to others.

Pennsylvania Supreme Court precedent has consistently held that Council "may legislate as to municipal functions as fully as could the General Assembly." *See Warren v. City of Philadelphia,* 382 Pa. 380, 384, 115 A.2d 218, 221 (1955); *see also Blackwell v. City of Philadelphia,* 546 Pa. 358, 367, 684 A.2d 1068, 1072 (1996) ("City Council, within the realm of its powers, is the legislative body under Philadelphia's home rule form of government and it is entitled to the same deference as is the General Assembly"). To "legislate" is "[t]o make or enact laws . . . [t]o bring (something) into or out of existence by making laws; to attempt to control (something) by legislation." Black's Law Dictionary 910 (7th ed.1999). This is exactly what occurred here—Council in enacting this law, expanded the class of residents who would be eligible to receive no-cost refuse collection. Such refuse collection is considered a "municipal function," within the legislative ambit of Council by the City's own Charter. *See* Section 5–500(c) ("The Department [of Streets] shall itself, or when specifically authorized *by the Council,* by contract, clean and sand City streets, *remove and dispose of ashes, garbage and refuse* . . . and administer and enforce statutes, *ordinances* and regulations for maintaining the cleanliness of City streets") (emphasis added).

The Charter specifically authorizes Council to, by ordinance, "add new powers and new duties, not inconsistent with the scheme of this charter, to the powers and duties of . . . departments. . . ." Section 2–305. Council has done so here, adding a new duty to the Streets Department.

The Mayor argues that, even if such acts by Council are not specifically appropriations, they nevertheless *require the City to expend funds.* Amicus similarly argue that the Bill has the effect of directing the Streets Department to spend its appropriated funds in a particular way: to provide no-cost trash collection for condominiums and cooperatives that were not previously receiving such collection. They argue that it is as if Council appropriated money for this specific purpose; therefore, the provisions of the Charter that prohibit Council from making line item appropriations will be meaningless if Council can circumvent this prohibition by directing a department to spend its funds in a particular way via an ordinance.

Council responds that, even though some expenditure of funds is necessitated as a result of a legislative act, that does not mean that the legislation is an appropriation or line-item budgeting. We agree that if we follow the Mayor's logic, "any ordinance, which . . . involves the expenditure of money, could be interpreted as providing detail to some class of expenditures and thus would violate the Charter." (Council's Brief, p. 24.) As common pleas correctly noted:

> The fallacy of the Mayor's argument is that, for just about every ordinance enacted by City Council, there will be a budgetary impact. *The Mayor's analysis would render City Council little more than an advisory council.*

(Trial Court op., p. 4) (emphasis added). Even taking into consideration their desire to create a "strong Mayor" form of government, the drafters of the City's Charter did not intend to so circumscribe Council that it could do no more than advise the Mayor with regard to any actions that involve an expense.[3]

---

**3.** This fact is made evident by Charter sec-

tions which clearly articulate that Council has

The Mayor also argues, as a separate reason why Council cannot mandate this service, that the Bill interferes with his responsibility to determine "whether to spend, or not to spend, appropriated funds." (Mayor's Brief, p. 22.) He relies on Sections 4–101(e) and 8–102 of the Charter to support his argument that it is fully within his executive authority to prevent the expenditure of funds if such expenditure threatens to cause a deficit or put a strain on the City's budget.[4]

We agree that the Mayor has power under the Charter to control spending in the City, provided that it is exercised consistently with other Charter provisions. As concisely stated in Council's brief:

> Under the Mayor's reasoning, Section 8–102 renders void *ab initio* any ordinance that might require expenditure of funds, since the Mayor might later order a spending freeze covering such expenditures. Such a reading of the Charter swallows whole the legislative powers of Council, since any ordinance characterized by the Mayor as imposing a direct or indirect burden on the City treasury would be struck down. Such a reading

undermines ... the rule that all provisions of a statute, charter or constitution must be assumed to have meaning.

(Council's Brief, p. 26.) Furthermore, the Charter, in Section 2–202, authorizes the Mayor to veto legislation, and gives Council the opportunity to override that veto. If the Mayor has the authority to simply disregard legislation because it requires the expenditure of funds, there would be no necessity for him to exercise his veto and no effect if Council overrode the veto: thus, this entire Section of the Charter would be rendered a nullity.

This highlights the crux of their disagreement. If the Mayor can unilaterally decide not to enforce any ordinance enacted by Council that requires a monetary expenditure because he has determined not to spend the money for it, Council indeed does become merely advisory in almost all actions except in setting out broad appropriations. This would render Council's legislative powers and the Mayor's veto power superfluous. Conversely, if Council can mandate the Mayor to expend funds for programs through legisla-

legislative authority. *See e.g.* Sections 1–101 (stating that "[t]he legislative power of the City ... shall be exclusively vested in and exercised by a Council ...."); 2–300 (stating that "[i]t shall be the duty of the Council ... to adopt the annual operating budget ordinance for the next fiscal year"); 2–305 (stating that "Council may by ordinance add new powers and new duties ... to the powers and duties of ... agencies of the executive and administrative branch of the City government ...."); 2–400 (stating that "Council shall have power by resolution to authorize inquiries and investigations to be conducted ... in aid of its legislative powers and functions.").

4. Section 4–101(e) of the Charter provides: "The Mayor shall ... [s]ee to it that the City does not, except in case of unforeseeable emergency, incur a deficit in any fiscal year."
  Section 8–102 provides:
  In order to enable the Mayor to avoid deficits and to check on performance, each officer, department, board and commission of the City ... shall from time to time as requested by the Mayor prepare and submit to him through the Director of Finance for approval or disapproval an estimate of the amount of money required for each activity or function to be carried on by him or it during the ensuing ... period of the current fiscal year as the Mayor shall prescribe. If such estimate does not meet with the approval of the Mayor, it shall be revised in accordance with the Mayor's direction and resubmitted for approval....
  After the approval of any such estimate, it shall be unlawful for the Director of Finance to approve the expenditure or encumbrance of any appropriation or part thereof except in accordance with such estimate, unless the same be revised with the approval of the Mayor.

tive ordinance, irrespective of whether he feels there is sufficient funding available, the Mayor's duty to maintain the fiscal integrity of the City could be compromised.

In resolving these competing views, we focus on this particular Bill, which equalizes eligibility for no-cost refuse collection, essentially providing that the residents in buildings with no more than six dwelling units, who currently receive the service, and residents in larger condominiums and cooperatives who do not, will all be treated equally. The Bill does not specify details of when, how, how often, with what equipment or personnel, the City will provide the service. These decisions remain within the administrative and fiscal prerogative of the Mayor. Thus, in this case, the legislative branch is not "micro-manag[ing] the executive's power to administer appropriated funds," as in *Common Cause*, 668 A.2d at 206. Prior to the Bill becoming law, the Mayor stated his intention not to enforce it. He outlined reasons why he could not "support the policy behind the bill." (Letter, page 1.) However, as previously discussed, the policy decision was legislative. Although he can and should participate in the policy debate, this policy decision was within Council's legislative powers. The Mayor does explain that, in his judgment, "in our current financial situation, and without a comprehensive review of all City services, we cannot afford this step now." However, there has been no attempt to carry out the program authorized by the ordinance, and no evidence that in providing this service, the City would necessarily incur a deficit, or that

the City lacks sufficient funds. The Mayor made a decision regarding "how best to spend [the City's] limited resources," but he must also follow the legislative mandates of Council in making that decision. He has not done so here. The City faces many challenges, and the Charter establishes the requirements for how the Mayor and Council, who are to work together in their respective roles, should resolve those challenges in the best interests of the City's citizenry.

For these reasons, the Mayor's arguments do not support his contention that Council did not have the power to enlarge the class of tax-paying citizens authorized to receive free refuse collection service.

■ Next, we must determine whether the Mayor has a duty to perform the ministerial act or mandatory duty, which is the second requirement to obtain a writ of mandamus.

■ We begin with the proposition that duly enacted legislation is entitled to a presumption of validity. *See The Public Advocate v. Philadelphia Gas Commission*, 544 Pa. 129, 138, 674 A.2d 1056, 1061 (1996) ("[a]s a legislative body, it is presumed that any laws enacted [by Council] will be constitutional"); *James v. Southeastern Pennsylvania Transportation Authority*, 505 Pa. 137, 142, 477 A.2d 1302, 1304 (1984) (there is a presumption of constitutionality attaching to any lawfully enacted legislation). Under the provisions of Charter Sections 2–201(1), (7) and 2–202, Bill No. 010659 became law when Council passed it by unanimous vote and the Mayor failed to sign it or enter a veto.[5] Thus,

---

5. Section 2–201(1) states: "Every proposed ordinance shall be introduced by bill." Section 2–201(7) states: "No bill shall become an ordinance unless a majority of all the members of the Council be recorded as voting in its favor."

Section 2–202 states, in pertinent part:
Every ordinance shall, before it takes effect, be certified to the Mayor for his approval. The Mayor shall sign the ordinance if he approves it, whereupon it shall become law. If he disapproves it, he shall return it to the

this legislation was duly enacted into law, and is presumed to be valid.

Charter Section 1–102 states that the executive and administrative power of the City is exclusively vested in and exercised by the Mayor. As such, and pursuant to Charter Section 4–100, the Mayor is responsible for the conduct of the executive and administrative work of the City and for law enforcement within City boundaries. Charter Section 8–300 requires the Mayor to take an oath of office to support, *inter alia,* the City Charter. Furthermore, pursuant to Section 6 of the Act of June 25, 1919, P.L. 581, *as amended,* 53 P.S. § 12127(a)(I), the Mayor has the duty "[t]o cause the ordinances of the city ... to be executed and enforced." Therefore, the Mayor is duty bound to comply with all Charter provisions and to enforce the law within City boundaries.

Here, Council passed the Bill, the Mayor did not exercise his veto power, and the Bill became law. Once this occurred, the Mayor was duty bound to enforce it as he would any other law. Although it is the Mayor who determines *how* to enforce the ordinance, he cannot decide *whether* to enforce it.

Consequently, we find that Council has proven a corresponding duty in the Mayor and has therefore met the second requirement for obtaining a writ of mandamus.

The third and final requirement for obtaining a writ of mandamus is "the absence of any other appropriate or adequate remedy." *Advantage Development, Inc.,* 743 A.2d at 1011. Council contends that there is no other adequate remedy at law and the Mayor has not argued the existence of any. Therefore, Council is successful on this point.

Thus, examining common pleas' decision in the light most favorable to the Mayor, and finding that Council met the requirements for mandamus, we affirm common pleas' order granting Council's motion for peremptory judgment.

President Judge COLINS did not participate in the decision in this case. Judge SMITH–RIBNER dissents.

### *ORDER*

**NOW,** August 25, 2004, the order of the Court of Common Pleas of Philadelphia County in the above captioned matter is hereby AFFIRMED.

---

Council with the reasons for his disapproval at the first meeting thereof held not less than ten days after he receives it. ... *If the Mayor does not return the ordinance within* *the time required, it shall become law without his approval.* (Emphasis added.)