DECISION
Before this Court for decision is a suit by Plaintiff, the City of Providence ("City"), against Defendants, Estate of Stephen A. Tarro, Richard M. Tarro, Michael A. Tarro, Patricia Tarro, and Bilray Demolition Co., Inc. The City seeks to fine Defendants for attempted demolition of a building without a permit; an order enjoining further demolition and requiring safeguarding of the building; and restoration of the building should Defendants not obtain a demolition permit. The Defendants counterclaim, seeking a writ of mandamus ordering the City to issue a demolition permit.
 I Facts and Travel "Delay always breeds danger; and to protract a great design is often to ruin it." — Miguel de Cervantes
The Grove Street Elementary School ("Grove Street School"), located at 95 Grove Street in Providence, is the subject of this dispute. Constructed in 1901, it has gone unused since 1975, when it ceased operating as a school. Sadly, over the course of three decades, what was once a vibrant place for the training of bright, young minds has become an empty, deteriorated building *Page 2 
littered with broken glass, drug paraphernalia, and debris. The parties to this dispute, having permitted the school to fall into its present state of disrepair, now look to this Court to decide its fate.
Based on testimony and evidence presented at a bench trial beginning October 29, 2007, the Court makes the following findings of fact. After closing the Grove Street School in 1975, the City retained possession of the building. By the early 1980s, numerous neighborhood residents began complaining about the Grove Street School to Joseph R. Paolino, Jr., then the City Councilman from Ward 13, where the property is located. The residents told Paolino that the building was a fire hazard and a place for "unruly activity" by youth and gangs. Transcript, Nov. 21, 2007 (Tr. IV) at 6.
By the end of 1982, the City was entertaining offers from prospective buyers. The December 6, 1982 meeting minutes of the City Council's Committee on City Property (Exhibit A) indicate the Committee's consideration of a proposal by Richard E. Tarro to purchase the Grove Street School. Tarro presented a plan to demolish the school and use the property as a parking lot for his adjoining business, a funeral home.Id. The minutes demonstrate that Tarro intended to "raze the building from his own money immediately. . . ."[1] Id. Residents of the neighborhood around the school were supportive of demolishing the building. The minutes also refer to a petition by more than 260 neighborhood residents who opposed a competing plan to purchase the former school for $12,000 and convert the school into an apartment house. Id. The committee voted to approve the sale, and on December 22, 1982, the City Council passed a resolution giving final authorization for the sale. (Exhibit B.) In a deed executed on January 19, *Page 3 
1983, the City conveyed the property to Richard E. Tarro and his wife, Carol Ann Tarro, for $10,000. Id. Paolino testified that a "condition" of the sale was that Richard E. Tarro would demolish the building.Tr. IV at 9. The committee asked attorneys for the City to structure the transaction so as to ensure that the property would revert to City ownership should Mr. Tarro fail to demolish the building, according to Andrew J. Annaldo, then the Chairman of the committee.Transcript, Nov. 15, 2007 (Tr. II) at 2-3. However, it appears that no written sales agreement was ever drafted. Tr. IV at 12. The deed to the property provides little insight into the terms, except to note that "said land and properties have become unsuitable and have ceased to be used for any public or municipal purposes." (Exhibit B.)
For reasons that have gone unexplored, Richard E. Tarro never demolished the Grove Street School. Initially, at least, Tarro's failure to demolish the building caused some annoyance to City officials. Paolino, who became mayor of the City in 1984, testified that he continued to receive complaints about the building and that he was bothered that Tarro had not kept his promise. Tr. IV at 11. The Committee on City Property took up the matter at a meeting on November 14, 1984. (Exhibit C.) Records from the meeting indicate that the committee sent a letter to Tarro requesting that he fulfill his commitment to demolish the building. (Exhibit C.) With still no action taken, the Committee voted to refer the matter to the City Solicitor's office to explore the City's legal options. (Exhibit C.) Annaldo testified that around that time he became aware that the requested clause requiring demolition of the school or reverter to the City had never been reduced to writing. Tr. II at 8.
Tarro remained unwilling to demolish the school, and the parties reached a stalemate. Years passed, the school's future going unresolved and its condition steadily worsening. Meanwhile, political momentum grew for preserving buildings like the Grove Street School as *Page 4 
historic structures. On March 12, 2002, the Providence Zoning Ordinance was amended to create, among other previously-established historic districts, a new "Industrial and Commercial Buildings District." (Exhibit 2.) The ordinance placed certain industrial and commercial buildings of historic character, including the school at 95 Grove Street, within the new historic district. (Exhibit 2.) Furthermore, the ordinance empowered the Historic District Commission (HDC), which regulates development in the City's historic districts, to require that owners of properties in the new district obtain a "certificate of appropriateness" from the HDC before conducting demolitions or alterations. See Providence Zoning Ordinance § 501.4.
Jason Martin, a principal planner for the City, testified that he prepares staff reports for the HDC's monthly meetings. He stated that at the time the Industrial and Commercial Buildings District was created, he had been involved in the process of selecting buildings for the new district. At the time the Grove Street School was designated as an historic property, Martin was unaware that the City had sold the property to Richard E. Tarro with the understanding that it would be demolished. If Richard E. Tarro had wished to object to the designation of the school as historic, he never had the chance. Tarro passed away on August 30, 2001, before the district's creation. A registered letter addressed to "Richard E. Tarro," mailed after his death on September 21, 2001, gave notification of an upcoming hearing on the ordinance which would create the historic district. In 2007, this letter was found unclaimed and in the possession of the City. The letter was the only notification sent to Richard E. Tarro.
 A Efforts to Demolish
The Defendants Richard M. Tarro, Michael Tarro, Patricia Tarro, and the Estate of Stephen Tarro (the "Tarros") are successors in interest to Richard E. Tarro. In 2004, Stephen *Page 5 
Tarro began an effort to demolish the school. Around September 2004, David A. Santanelli, an employee of Bilray Demolition Co. ("Bilray"), filed an application on behalf of Stephen Tarro with the Providence Department of Inspections and Standards ("Department") to demolish the Grove Street School.
When the permit was not forthcoming, Tarro sought assistance from attorney John La Terra Bellina.[2] According to La Terra Bellina, he and Tarro visited the Department to inquire about the permit. They were informed by Edgar Paxon, then the building official, that the property had been placed within the Industrial and Commercial Buildings District. Paxon told them the permit could be issued only by obtaining a certificate of appropriateness or a letter from the City Solicitor authorizing the demolition. La Terra Bellina subsequently obtained a letter from Olayinka Oredugba, Assistant City Solicitor, which authorized Paxon to approve demolition of the building. However, the October 6, 2004 letter included the caveat that the demolition must proceed in accordance with the state building code. In her trial testimony, Oredugba could not recall issuing the letter, nor could she recall any of the relevant circumstances. In fact, she only acknowledged her signature on this letter after persistent questioning by the Court.
On or about October 6, 2004, La Terra Bellina and Stephen Tarro met with Paxon again. Paxon informed them that the demolition permit could not be granted because the letter was insufficient. La Terra Bellina recalled that Tarro advised Paxon of the deteriorating condition of the Grove Street School and that trespassers frequented the property. Following the meeting, the *Page 6 
Department never issued a demolition permit; the application remained in a gray file cabinet in Paxon's office until it was produced during the discovery phase of this litigation.
Efforts to demolish the building were placed on hold until 2007. On January 29, 2007, Jason Martin, a principal planner, received an anonymous phone call stating that work was being done to prepare the Grove Street School for demolition. He then contacted Michael Tarro, who stated that there were no immediate plans to demolish the school. After inspecting the building himself, Martin observed tracks suggesting that that material had been dragged from the building, a step typically taken in preparation for demolition. Martin reported his observations to the Department, and on January 31, a stop-work order was placed on the southwest door of the school by William Packard, a building inspector for the City, with Martin present.
On Friday, February 2, 2007, Bilray filed an application for a permit to demolish the school. The application did not contain a certificate of appropriateness from the HDC, though it was complete in every other respect. David Santanelli, presently Bilray's principal, testified that on January 21, 2007, Stephen Tarro showed him a copy of a document which Tarro claimed was a certificate of appropriateness to demolish the school; Tarro subsequently provided Santanelli with a copy of the document. Martin testified that although the document was nearly identical to the standard certificate of appropriateness issued by the HDC, the document was not authentic. The Tarros have never applied to the HDC for a certificate of appropriateness to demolish the Grove Street School. Transcript, Oct. 29, 2007 (Tr. I) at 79.
Without waiting for the permit to be processed, Bilray commenced demolition the following day, Saturday, February 3, 2007. Concerned neighbors called the Providence Police to the scene. The police instructed Bilray to cease demolition. By the time the police arrived, the demolition had caused damage to about 30 feet of wall along the easterly side of the building and *Page 7 
approximately 25 feet of wall along the southern side. A stairwell and portions of the roof had been damaged, and wooden beams supporting the building had been exposed. About 8 to 10 percent of the building was demolished, according to William Yoder, an architectural engineering expert for the City.
As events were unfolding at the school, William Bombard, director of the Department, received a call from the mayor's staff asking him to investigate. Bombard and other City officials, including Martin and Edward Civito, the acting building official, arrived at the scene. The stop-work order which had been posted two days earlier was no longer posted; Bombard saw only brass tacks on the door. At the direction of Civito, Bilray demolished an additional portion of the roof in order to minimize the safety hazards resulting from the partial demolition.Tr. I at 64. Civito then issued a second stop-work order.
Beginning the morning of February 3, 2007, when Defendants attempted demolition, and continuing until about noon on February 6, 2007, the City maintained a police presence at the Grove Street School to ensure that no more attempts were made at demolition. The City estimates that the costs of this surveillance, over approximately 74 hours, were $1,868.98. (Exhibit 13.) On February 5, 2007, the City issued the Tarros a notice of violation for demolishing the building "without obtaining the necessary approvals and permits for demolition." (Exhibit 10.) The City issued another such notice on March 19, 2007. (Exhibit 11.)
The City filed this action on February 5, 2007, seeking to fine Defendants for attempting to demolish the building without a permit. Additionally, the City sought an order preventing further demolition of the school and an order to restore the building to its condition prior to the demolition. On February 27, 2007, the Superior Court issued an injunction ordering the *Page 8 
Defendants to secure the Grove Street School to protect the building from the elements and prevent trespassers from entering. Despite measures to secure the building, a small fire broke out in July 2007.
 B Condition of the Building
The current condition of the building is abysmal. Plaster is falling from the interior walls, broken glass litters the floors, and the building's stairwells have collapsed. Vandals have dotted the building with graffiti, and drug paraphernalia can be found in the interior. The Court observed these details upon conducting its view of the building on October 29, 2007. The Grove Street School is at a heightened risk of fire due to the amount of combustible debris inside. The Court did not receive evidence as to the cause of the fire in July.
Structurally, the brick exterior of the building is capable of being preserved, according to architectural engineer Yoder. Despite some cracking of the bricks and some falling away of bricks at the school's entrance, the bricks have a glazed surface which helps them to remain durable. Based on a visual inspection conducted in May 2007, Yoder testified that the building was "structurally sound." The fire that occurred following Yoder's visit apparently caused little additional structural damage to the building. Both Yoder and the Defendants' expert witness, Gerald Vezina, found that with enough money, the building could be restored.
However, Vezina, who possessed structural engineering expertise, concluded that the building is "structurally unsafe" and that it would not comply with any state building code known to him. Vezina singled out rotting floors and beams as the building's most dangerous condition. In some areas, the second floor has so deteriorated that it is missing, making it possible to view into the second floor from the first floor. Vezina observed that the main beam *Page 9 
supporting the floor on the south side of the building has rotted. According to Vezina, the rotting of interior beams could cause the floors of the building to collapse; if this happens, the walls of the building which rely on those floors for support might also collapse. He commented that part of the reason for the deterioration of the building has been that it has gone unheated, leaving it susceptible to freeze and thaw cycles.
Conditions at the Grove Street School have not received significant attention from the City. Paxon testified that during his four-year tenure as building official, he never inspected the Grove Street School, nor did he recall sending any other inspector to view the building. Kerry Anderson, the present acting building inspector, performed a cursory inspection of the property after the fire in July 2007, but took no action afterwards. Rather than seeking either demolition or rehabilitation of the former school, the City's approach has been to require it to be boarded. According to Civito, "being boarded and secured it would be safe."
On the other hand, it does not appear that the owners of the Grove Street School have sought to draw attention to the condition of the building, at least until now. Aside from La Terra Bellina's statement to Paxon in 2004 that the building presented safety hazards, there is no evidence that any of the Tarros ever asked the City of Providence to inspect the former school or make a determination as to its condition.
 C Bench Trial
The City of Providence now seeks a fine for attempting demolition without a permit, a fine for violating its stop-work order, compensation for police surveillance of the Grove Street School in the aftermath of the attempted demolition, and an order preventing further demolition. The City also seeks an order requiring Defendants to restore the Grove Street School to its pre-demolition *Page 10 
condition should the Tarros and Bilray not obtain a certificate of appropriateness within six months of this Decision.[3] The Defendants, advancing multiple theories, seek a writ of mandamus ordering Kerry Anderson, the acting building official for the City of Providence, to issue them a permit to demolish the Grove Street School. The Defendants first contend that Anderson was required to perform his ministerial duty of approving their permit application and issuing a demolition permit because their application was complete. Next, Defendants aver that the building inspector is statutorily required to declare the Grove Street School unsafe and order demolition pursuant to G.L. 1956 §§ 23-27.3-124.1
and 23-27.3-125.5.
This Court, sitting without a jury, heard testimony in this matter on five separate occasions between October 29, 2007 and November 28, 2007. Anderson was questioned at trial concerning his decision, on June 29, 2007, to order the demolition of another building, the Providence Fire and Police Building, located at 197 Fountain Street in Providence. Additionally, in January 2008, after the record had been closed, the Court learned that Anderson had ordered the demolition of another structure, the Providence Fruit and Produce Warehouse Co. building ("Farmer's Market"), for safety reasons. Many safety concerns cited publicly by Anderson in deciding to order demolition of the Farmer's Market were identical to those that this litigation raised regarding the Grove Street School — which Anderson had not ordered demolished.
Accordingly, on January 16, 2008, this Court reopened the record in order to receive additional testimony from Anderson. See Conn. ValleyHomes of E. Lyme, Inc. v. Bardsley, 867 A.2d 788, 795 (R.I. 2005) ("When sitting without a jury, a trial justice is vested with broad discretion to . . . reopen the case and take additional evidence when appropriate."). On February 4, 2008, the Court called Anderson to the stand as its own witness pursuant to Rule 614 of the *Page 11 
Rhode Island Rules of Evidence. The Court conducted its own examination of Anderson, after which the City, the Tarros, and Bilray were permitted opportunities for cross-examination.
 II Standard of Review
In a non-jury trial, "the trial justice sits as the trier of facts as well as of law." Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). "Consequently, he weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences."Id. The factual determinations and credibility assessments made by a trial justice "traditionally . . . [are accorded] a great deal of respect." In re Dissolution of Anderson, Zangari Bossian,888 A.2d 973, 975 (R.I. 2006). It is the trial justice who "has actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record."Id.
After hearing the evidence, the trial justice must "find the facts specifically and state separately its conclusions of law thereon." Super. R. Civ. P. Rule 52(a). "Even brief findings will suffice as long as they address and resolve the controlling factual and legal issues."White v. Le Clerc, 468 A.2d 289, 290 (R.I. 1983) (citing J.W.A. Realty,Inc. v. City of Cranston, 121 R.I. 374, 384, 399 A.2d 479, 484-85
(1979)).
 III Analysis
The present dispute is the result of more than 25 years of foot-dragging by the parties involved. So much time has passed since 1983, when the City sold the Grove Street School to Richard E. Tarro, that a role reversal has actually taken place. The Tarros, who once resisted City pressure to demolish the Grove Street School, now seek to demolish the building over the *Page 12 
City's objections. Although the parties have changed their positions, in some ways nothing has changed. The parties remain at an impasse.
As the Court's hand is thrust into this matter, it does not view either the Tarros or the City as blameless. The Tarros failed to take advantage of a 20-year window in which to demolish the Grove Street School. The City failed to enforce the state building code, thereby permitting a public safety hazard to arise and reducing the practicality of preserving the building. At this late stage, the Court has no choice but to clean up — literally — the mess created by the parties.
 A Unauthorized Demolition
The City's primary claim against Defendants remains a simple one: Defendants attempted demolition of the Grove Street School without first obtaining a demolition permit and should remedy that violation. The state building code provides that "[i]t shall be unlawful to . . . demolish a building . . . without first filing an application with the building official in writing and obtaining the required permit therefore." Section 23-27.3-113.1. The Defendants have not complied with this provision.
The Defendants filed an application for a demolition permit on February 2, 2007, but were not issued a permit before commencing demolition the following day. Their application was incomplete because it lacked a certificate of appropriateness, which is required for owners of buildings, like the Grove Street School, which are located in an historic district. See Providence Zoning Ordinance § 501.4 ("Before a property owner commences . . . demolition of any existing structure within an historic district overlay zone, the owner must first apply for and receive a certificate of appropriateness from the HDC"); see alsoKooloian v. Town Council of Bristol, 572 A.2d 273, 276 (R.I. 1990) (requiring owners of a nineteenth century Bristol building to *Page 13 
obtain a certificate of appropriateness before the building official could grant a demolition permit). The certificate of appropriateness which Santanelli testified he received from Stephen Tarro could not have been authentic because the HDC never issued one.
Likewise, Defendants' application for a demolition permit in 2004 did not grant them the right to commence demolition on February 3, 2007. No permit was actually issued in 2004 because Defendants lacked a certificate of appropriateness. Even if one had been issued, it would no longer have been valid on February 3, 2007. A demolition permit becomes invalid unless demolition commences within six months after the issuance of the permit. See § 23-27.3-114.2.
Defendants argue that they should not be faulted for commencing demolition without obtaining a demolition permit because the Cityshould have issued them a permit or, on its own initiative, required demolition of the Grove Street School. Yet, even if the City erred in not granting Defendants a demolition permit, such error would not excuse Defendants for disregarding the requirement, pursuant to §23-27.3-114.2, that they obtain a permit prior to demolition. If Defendants believed the building official was required to issue them a demolition permit without a certificate of appropriateness, they could have sought relief through legal channels, either to this Court or by appealing the building official's decision. See § 23-27.3-127.2.5
(allowing appeal of building official's action to a local board of appeals). Consequently, this Court finds that Defendants commenced demolition without obtaining the proper authorization.
The City's second major claim is that Defendants violated a stop-work order. An owner is required immediately to stop work on a building upon notification by the building official that the work being performed violates the state building code. See § 23-27.3-123.1. The City *Page 14 
contends that by commencing demolition, Defendants violated and disregarded a stop-work order notice placed on the southwest door of the Grove Street School on January 31, 2007.
It is unclear whether Defendants received notice of the stop-work order. The evidence at trial established that the stop-work order was no longer on the door when City officials arrived at the building on the day of the attempted demolition. It is unknown whether any of the Defendants observed the posted stop-work order or who, if anyone, removed it from the door.[4] The Defendants imply that because the stop-work order was no longer on the building when City officials arrived, notice of the stop-work order was defective.
The Court has not received the necessary evidence to conclude that the City gave proper notice to Defendants that a stop-work order had been issued. The state building code requires the building official to serve an owner or "person responsible" with a stop-work order either by civil process or by regular or certified mail. See § 23-27.3-122.1.2. If the "last and usual place of abode is unknown," then an acceptable manner of service is "by posting a copy of the order or notice in a conspicuous place on or about the premises in violation." Id. The state building code provides one exception to these notice requirements. The building official may give a verbal stop-work order "where immediate action is deemed necessary for public health, safety, and welfare, or in the public interest." Section 23-27.3-123.1.
No evidence has been presented that the City notified Defendants by civil process or by mail of the issuance of a stop-work order. Although the City posted a stop-work order in a conspicuous place on the Grove Street School, the City has not shown that it did not know the "last and usual place of abode" of any of the Defendants. Additionally, the City has not *Page 15 
presented evidence to show that, prior to February 3, 2007, Defendants received a verbal order to stop demolition work.[5]
The state building code uses the term "shall" in the provision describing the methods of service. See § 23-27.3-122.1.2 (notice "shall be served on the owner or the person responsible" (emphasis added)). It further states, specifically, that the building official "shall" comply with the notice requirements of the code when issuing a stop-work order. See § 23-27.3-123.1. The term "shall" is "considered presumptively mandatory unless there is something in the context or the character of the legislation which requires it to be looked at differently." Norman J. Singer, 3 Sutherland on Statutes and StatutoryConstruction § 57:2 at 7 (6th ed. 2001); see also Gross v. State,659 A.2d 670, 671 (R.I. 1995) ("Compliance with [G.L. 1956 § 8-8-26] is mandatory since the Legislature's repeated use of the word `shall' permits no other conclusion."). However, mandatory language is sometimes construed as directory. See, e.g., New England Dev., LLC v. Berg,913 A.2d 363, 368 (R.I. 2007) (noting that "statutes imposing apparently mandatory time restrictions on public officials are often directory in nature"). The key factor is legislative intent. See Roadway Express v.Rhode Island Comm'n for Human Rights, 416 A.2d 673, 674 (R.I. 1980) (stating "intention of the Legislature controls our consideration of the mandatory or directory character of statutory provisions"). If a statute is intended for the benefit of a public official "to promote d[i]spatch, method, system, and uniformity in the mode of proceeding," then the statute is more likely to be directory. See Cole v. Warwick CoventryWater Co., 35 R.I. 511, 521, 87 A. 307, 310 (1913); see alsoCommonwealth v. Rafferty, 241 Va. 319, 324 (Va. 1991) (a "statute directing the mode of proceeding by public officers is to be deemed directory") *Page 16 
(citation omitted); Washington Highway Dev't, Inc. v. Bendick,576 A.2d 115, 116 (R.I. 1990) (reiterating same).
The state building code evidences a legislative intent to make the notice provisions at issue mandatory. The provision defining what constitutes a violation of a stop-work order indicates that notice is necessary for a violation of said order to occur. Pursuant to §23-27.3-123.2 (entitled "Unlawful continuance"), a building owner who continues work "after having been served with a stop-work order" (emphasis added) is subject to criminal penalties and fines. The fact that violation of a stop-work order may result in criminal penalties is a further indication that the notice requirements are mandatory.See State v. Tobin, 602 A.2d 528, 534 (recognizing notice provisions aid in establishing mens rea). The Court also notes that the state building code provides an exception for verbal notice in emergency situations, when sending written notice may be too slow to force an immediate halt to unauthorized work. The Legislature's providing such an exception further evidences its intent to make the subject notice provisions mandatory. Thus, by specifying that, for a violation to occur, service with a stop-work order is necessary, the state building code indicates that the notice requirements, as defined by the state building code, are mandatory.
Although Defendants attempted demolition without a permit, the Court does not have before it sufficient credible evidence that the City issued Defendants either written or verbal notice of the stop-work order as required by the state building code. Accordingly, the Court cannot find that Defendants violated a stop-work order.
 IV Writ of Mandamus
While the City seeks an order enjoining further demolition, Defendants request a writ of mandamus ordering the acting building official, Kerry Anderson, to issue a demolition permit to *Page 17 
demolish the Grove Street School. "On occasion, [our Supreme Court] has held that a private individual has standing to bring a mandamus action when the private interest to be protected is independent of the public interest." O'Neill v. Carr, 522 A.2d 1213, 1214 (R.I. 1987) (citingDaluz v. Hawksley, 116 R.I. 49, 52, 351 A.2d 820, 823 (1976)).
Mandamus may be used to compel performance by public officials of a legal duty devolving upon them by virtue of their office or which the law enjoins as a duty resulting from the office. See Bd. of CountyComm'rs v. County Road Users Ass'n, 11 P.3d 432, 437 (Colo. 2000). It may enforce or protect a private right unrelated to the public interest, or a public right, where the general population is the true party in interest. Eugene McQuillen, 17 Municipal Corporations, § 51:12 (rev. 3d ed. 2004). Under Rhode Island Law, it is well-settled that "[a] writ of mandamus should only issue when (1) the party petitioning for such an extraordinary remedy has shown a clear legal right to obtain the relief sought by the writ; (2) the respondent has a ministerial legal duty to perform the requested act without discretion to refuse; and (3) the petitioner possesses no adequate remedy at law." P.J.C. Realty, Inc. v.Barry, 811 A.2d 1202, 1205 (R.I. 2002) (quoting Providence TeachersUnion Local 958 v. Providence School Bd., 748 A.2d 270, 272 (R.I. 2000)). When these prerequisites have been met, "it is within the sound discretion of the Superior Court justice to ultimately issue the writ."Id. (citing Martone v. Johnston School Committee, 824 A.2d 426, 429
(R.I. 2003)). As a writ of mandamus is an "extraordinary remedy," this Court must ensure that the three aforementioned requirements have been met before granting this exceptional relief. Krivitsky v. Town ofWesterly, 849 A.2d 359, 362 (R.I. 2004); see also Berg, 913 A.2d at 368
(R.I. 2007) (characterizing writ of mandamus as "extreme remedy"). *Page 18 
 A Clear Legal Right
A "legal right" is merely one which is recognized by law; it is "[t]he capacity of asserting a legally recognized claim against one with a correlative duty to act." Black's Law Dictionary 1348 (8th ed.). "Within the meaning of the rule of mandamus, a `clear, legal right' is one `clearly founded in, or granted by law; a right which is inferable as a matter of law from uncontroverted facts regardless of the difficulty of the legal question to be decided.'" University Medical Affiliates, P.C.v. Wayne County Executive, 369 N.W.2d 277, 281 (Mich.App. 1985) (internal citations omitted). This right "embraces `not only the character of the claim, but also the form in which it is presented,' and this must be determined by the state of the law and the facts existing at the time the proceeding is instituted. . . .'" 55 C.J.S.Mandamus § 57(a) (1998) (internal citations omitted). It is no surprise that where the terms of a statute or ordinance prescribe the acts to be performed by a local officer or administrative body upon application of a landowner, it becomes a clear legal duty of that officer to perform that act when the landowner has a right to have it performed. Rathkopf,The Law of Zoning Planning, § 64:4 (2005).
The Tarros are the owners of the Grove Street School. Consequently, this Court is satisfied that the Tarros have a "particular interest" in not only obtaining a permit to demolish the building so that they may use the property as they desire and protect its value, but also in eliminating the safety hazards presented by the building.O'Neill, 522 A.2d at 1214 (determining plaintiffs had standing to seek issuance of writ to enforce local zoning ordinance where proposed nearby development would cause potential decrease in property value); see alsoDaluz, 116 R.I. at 53, 351 A.2d at 823 (finding beneficiaries of retirement fund administered by state officials qualified to seek mandamus, as particular interest is independent, particular, and different from right held in common with public); Schroder v. City ofLincoln, 52 N.W.2d 808, *Page 19 
813 (Neb. 1952) ("the fact that plaintiff must show injury to his personal or property rights to qualify him to litigate in reference to public rights, does not prevent him from maintaining an action because it involves public rights and also matters affecting adversely his individual property rights"); Dombrowski v. City of Philadelphia,245 A.2d 238, 242 (N.J. 1968) (commenting "relevant inquiry is whether private plaintiff possesses an interest which is not shared by the public at large"). Additionally, the Tarros are defendants in this lawsuit instituted by the City; the family is intimately involved in this Court's determination of the rights that they have relating to the Grove Street School. As such, they have standing to seek a writ of mandamus in their own name.
The Tarros advance several theories as to why they have a "clear legal right" to a demolition permit from the acting building official. Initially, the Tarros contend they have an enforceable contract to demolish the building. The Tarros argue that they cannot be required to obtain a certificate of appropriateness because they have a right to a demolition permit stemming from the sale of the property to Richard E. Tarro. They argue that in 1983, the City and Richard E. Tarro entered into an enforceable contract giving Tarro the right to demolish the Grove Street School. According to the Tarros, this contract right survives today and defeats the requirement that they obtain a certificate of appropriateness.
Although the Court finds on the evidence before it that the Grove Street School was sold to Richard E. Tarro with the understanding that he would demolish it, the Court finds that any legally enforceable demolition agreement at the time of the sale no longer is enforceable. A basic contract principle is that "a party's material breach of contract justifies the nonbreaching party's subsequent nonperformance of its contractual obligations." Women's Dev. Corp. v. City of Cent.Falls, 764 A.2d 151, 158 (R.I. 2001). A material breach may be defined as one that *Page 20 
"`substantially defeats [the contract's] purpose'" or one that contravenes a term that the parties consider "`vital to the existence of the contract.'" Id. (quoting UHS-Qualicare, Inc. v. Gulf Coast CommunityHospital, Inc., 525 So. 2d 746, 756 (Miss. 1987)).
Assuming, arguendo, that the City and Richard E. Tarro formed an enforceable agreement providing for demolition of the former school, that agreement clearly contemplated that Richard E. Tarro would demolish the Grove Street School — ostensibly by obtaining a demolition permit — within a short time after the sale. By not fulfilling this obligation, Richard E. Tarro would have materially breached the agreement. Therefore, the Tarros do not have a contractual right to a demolition permit that makes it unnecessary for them to obtain a certificate of appropriateness.[6]
Defendants further argue that a certificate of appropriateness is unnecessary with respect to a building permit to demolish because the City did not give proper notice to the owners of the Grove Street School of the proposed inclusion of the building within the Industrial and Commercial Building District. Richard E. Tarro passed away on August 30, 2001. Less than a month later, on September 21, 2001, the City sent a notice of the proposed designation by registered mail to "Richard E. Tarro," but the letter went unclaimed.[7]
Despite the poor timing of the letter, Defendants have not shown that the City failed to give proper notice under Rhode Island law. Pursuant to G.L. 1956 § 45-24-53(c)(2), property owners affected by a proposed zoning ordinance must be sent notice by registered or certified *Page 21 
mail to the address of the owners "as shown by the current real estate tax assessment records of the city or town in which the property is located." Defendants have not demonstrated that by addressing the letter to "Richard E. Tarro," the City failed to comply with this obligation. Moreover, the statute provides that "[n]o defect in the form of any notice under this section shall render any ordinance or amendment invalid, unless the defect is found to be intentional or misleading." Section 45-24-53(f). In this case, the Court has no basis to conclude that any defect in the letter was intentional or misleading.
Additionally, Defendants contend that the October 6, 2004 letter from Assistant City Solicitor Olayinka Oredugba to building official Edgar Paxon dispensed with the need to obtain a certificate of appropriateness from the HDC. The letter stated as follows: "This letter shall serve as authorization for you to approve the demolition of any or all structures present on the above-listed property. Said approval and demolition shall be carried out in accordance with the state building code, G.L. § 23-27.3, et seq."
By adding the caveat that the demolition needed to be carried out in accordance with the state building code, the letter, on its own terms, arguably does not evidence that Paxon could issue a demolition permit where the Tarros lacked a certificate of appropriateness. A building official is responsible for enforcing municipal ordinances.See § 23-27.3-108.1. Assuming the intent of the letter was to authorize the granting of a demolition permit without first obtaining a certificate of appropriateness, Defendants were not entitled to rely on the letter, as it could not take precedence over a City ordinance.See Town of Johnston v. Pezza, 723 A.2d 278, 283 (R.I. 1999) (permit to build asphalt plant was invalid where building official had issued a permit in contravention of ordinance requirements). Moreover, even if the letter did grant the Tarros the *Page 22 
right to a demolition permit in 2004, it does not grant them that right today, as a demolition permit becomes invalid after six months pursuant to § 23-27.3-114.2.
Although the Tarros do not have a clear legal right to demolish the building pursuant to an enforceable contract with the City at the time of purchase, as a result of defective notice, or through order by a city official, the Tarros still retain the right to compel the building inspector to act regarding the Grove Street School because the Tarros possess legal rights under §§ 23-27.3-124.1 and 23-27.3-125.5 addressing unsafe and hazardous buildings. State ex inf. Riederer ex rel. PerishingSquare Redevelopment Corp. v. Collins, 799 S.W.2d 644, 649 (Mo.Ct.App. W.D. 1990) ("Whether a petitioner's right to mandamus is clearly established and presently existing is determined by examining the statute or ordinance under which petitioner claims the right.").
These statutes undoubtedly impose an obligation upon the building official to take action upon finding that a particular structure is a danger to the public.[8] Id.; see also Schroder, 52 N.W.2d at 813
(stating private party and public may share common interest, but this overlap will not affect private party's right to enforce statute). During the Tarros' permitting process, the building official inspected the Grove Street School. Although the building inspector did not openly admit that the Grove Street School was unsafe or hazardous at the time of his inspection, his admissions thereafter certainly reflect the building's condition at that earlier point in time. 52 Am. Jur. 2dMandamus § 47 (stating duty must exist at time writ of mandamus is applied for). Most importantly, these admissions indicate that the building remains in a condition far south of deplorable, potentially injurious to the general public. As property owners, the Tarros may be subject to liability based on the building's hazardous conditions. The inspector's comments *Page 23 
indicate a state of disrepair that is certainly detrimental to the value of the Tarros' property. Consequently, this Court finds that the Tarros have a clear legal right, as owners of the Grove Street School, to compel the building inspector to act pursuant to §§ 23-27.3-124.1,23-27.3-124.2, and 23-27.3-125.5 of the State's building code. SeeDaluz, 116 R.I. at 53, 351 A.2d at 823 (statute providing rights for public inspection of investment records against official in possession of such records permissibly brought by private party having particular interest in outcome of administration of those investments).
 B Clear Legal Duty
"It is well settled that mandamus will issue to compel a public officer . . . to perform a ministerial duty"; Adler v. Lincoln HousingAuth., 623 A.2d 20, 25 (R.I. 1993) (citations omitted), however, "[i]t should be noted that the writ will not issue to compel a public officer to perform an act[,] the performance of which rests within his discretion." Id. (citations omitted).
The Rhode Island Supreme Court has defined a "ministerial function" as "one that is to be performed by an official in a prescribed manner based on a particular set of facts `without regard to or the exercise of his own judgment upon the propriety of the act being done.'" Arnold v. R.I.DOL Training Bd. of Review, 822 A.2d 164, 167 (R.I. 2003) (quotingBeacon Restaurant v. Adamo, 103 R.I. 698, 703, 241 A.2d 291, 294
(1968)); see also Smith v. Lewis, 669 S.W.2d 558, 563 (Mo.App. 1983) (describing discretionary act as "one requiring the exercise of reason in determining how or whether the act should be done"). A ministerial function is akin to an action that is "mechanical" in nature. SeeArnold, 822 A.2d at 167 (act of calculating attorney's fees would be "mechanical" and therefore a ministerial function). It *Page 24 
includes the duty to issue a building permit when all requirements for the permit are satisfied. See Crowe, 841 A.2d at 677.
The Defendants argue that pursuant to the state building code, the City has a ministerial duty to order demolition of the Grove Street School. The state building code defines two situations in which the building official may order the demolition of a building that poses a safety hazard — even if the building is located in an historic district and the owner has not obtained a certificate of appropriateness. The first of these situations is when the building official determines that a building is "unsafe." Section 23-27.3-124.1 ("Unsafe conditions") defines the criteria for an "unsafe building":
 A building, sign, or structure shall be declared unsafe by the building official if any one of the following conditions exists upon the premises:
 (1) The building is vacant, unguarded, and open at doors or windows thereby permitting unauthorized entry; or
 (2) There is a hazardous accumulation of dust, debris, or other combustible material therein; or
 (3) There is a falling away, hanging loose or loosening of any siding, block, brick, or other building material; or
 (4) There is a deterioration of the structure, or structural parts, or a structural weakness exists whereby the continued use and occupancy would endanger the lives of the occupants or those using public or private land in the immediate area; or
 (5) The building has been partially destroyed or has been substantially damaged by the elements, acts of God, fire, explosion, or otherwise, and is vacant, regardless of whether or not the building is secured to prevent unauthorized entry; or
 (6) The building or structure has been vacant or unused for more than one hundred eighty (180) days, whether or not it has been boarded, guarded, and/or closed at all doors and windows, and has remained in a condition such that the repairs necessary to make the building or structure safe and sanitary for occupancy exceed fifty percent (50%) of the fair market value of the building or structure in its present condition.
 (7) The building, sign, or structure constitutes a fire or windstorm hazard or is, in the opinion of the building official, otherwise *Page 25 
dangerous to human life or public health, safety, and welfare; or
 (8) There is an unusual sagging or leaning out of plumb of the building or any parts of the building, and the effect is caused by deterioration or over-stressing; or
 (9) The electrical or mechanical installation or systems create a hazardous condition contrary to the standards of this code or the code in effect at the time of construction; or
 (10) An unsanitary condition exists by reason of inadequate or malfunctioning sanitary facilities or waste disposal systems; or
 (11) The use or occupancy of the building is illegal or improper because the building does not comply with the allowable areas, height, type of construction, fire resistance, means of egress, liveload, or other features regulated by the code in effect at the time of construction; or
 (12) Whenever the building or structure has been so damaged by fire, wind, or flood, or has become so dilapidated or deteriorated as to become an attractive nuisance to children who might play therein to their danger.
With respect to declaring a building "unsafe," the authority of a building official to thereafter order the demolition of an "unsafe" building is specified in § 23-27.3-124.2 ("Notice of unsafe condition"), which provides:
 When the whole or any part of any building, sign, or other structure shall be declared to be in an unsafe condition, the building official shall issue a notice of the unsafe condition to the owner of record describing the building or structure deemed unsafe, and an order either requiring that the building, sign, or structure be made safe or be demolished within a reasonable, stipulated time. All notices and orders shall be in writing and shall be delivered to the owners of the building by the building official or his or her designated agent or shall be sent by registered or certified mail to the last known address of the owner or owners.
The other situation in which a building official may order demolition is when a building official deems a building to be "hazardous." Section23-27.3-125.5 ("Hazardous Buildings") provides:
 Whenever a building is in such hazardous condition as to create an immediate danger to the public health, safety, and welfare, either because of its potential as a fire hazard or because of the danger from collapse, the building official may board up the building *Page 26 
immediately at the owner's expense and may order its immediate demolition. In the event that the owner fails to comply immediately with the order to demolish then the building official may demolish the building at the expense of the owner.
After visiting the Grove Street School, hearing hours of expert testimony, and reviewing photographs of the building entered into evidence, the Court is convinced that, by any objective measure, the Grove Street School meets all, or nearly all, the criteria for an "unsafe" building. Indeed, all of the experts in this case agreed that "unsafe" conditions exist at the Grove Street School. The Court also believes, after taking a view of the property, that the building is in "such hazardous condition as to create an immediate danger" to the public. On any given day, a trespasser could easily fall through one of the floors or a fire, like the one in July, could burn uncontrolled.
Although the Grove Street School is clearly a minefield of safety hazards, the City argues that any determination that a building is either "unsafe" or "hazardous" under the state building code — as well as any determination about how to address those conditions — is not ministerial. The Court recognizes that the determination of "unsafe" or "hazardous" conditions requires some degree of judgment, or at least the application of law to facts.[9] "[A]n act is none the less ministerial because the person performing it may have to satisfy himself that the state of facts exists under which it is his right and duty to perform the act." Hamlet Hospital Training Sch. for Nurses, Inc. v. JointCommittee on Standardization, 68 S.E.2d 862, 868 (N.C. 1952) (internal citations omitted). The Court is also mindful that mandamus "will not lie to control the exercise of a discretionary power, which would in effect substitute the discretion of the court for that of *Page 27 
the person or body designated by statute and the law. . . ." Cruise Smiley Constr. Co. v. Town Council of Lincoln, 42 R.I. 408, 411,108 A. 419, 420-21 (1920).
Consequently, some discretionary acts cease to be discretionary when, in the opinion of the public official with discretion, the legal requirements triggering mandatory action are met. It is recognized that "[a] ministerial duty on the part of an official often follows a quasi-judicial determination by that official as to the existence of a state of facts." Pluhowsky v. New Haven, 197 A.2d 645, 651 (Conn. 1964). "Although the determination itself involves the exercise of judgment, and therefore is not a ministerial act, the duty of giving effect, by taking appropriate action, to the determination is often ministerial."Id. For example, in Wood, 416 A.2d at 694, a building inspector did not dispute that the necessary requirements for granting a building permit were met, but refused to issue the permit. The Rhode Island Supreme Court, finding that the inspector's duty had become ministerial, granted a writ of mandamus and ordered him to issue the permit. Id.; see alsoJohnson Wales College v. Di Prete, 448 A.2d 1271, 1276-77 (R.I. 1982) (building official required to issue occupancy certificate where determination was made that requirements for certificate were met).
In the present case, the acting building official has himself determined that the Grove Street School is "unsafe" or perhaps even "hazardous" under the state building code. Before this Court, under oath, Anderson stated that in his judgment, "the Grove Street School meets the criteria of an unsafe building." Transcript, Nov. 28, 2007 (Tr. V) at 28. Anderson further agreed that eleven of the criteria for an "unsafe" building, pursuant to § 23-27.3-124.1, were met with respect to the property. Id. at 32.
During testimony before this Court on February 4, 2008, Anderson discussed characteristics of the Grove Street School in relation to another building — the Farmer's *Page 28 
Market — that he recently ordered demolished. Although Anderson was unwilling to state that unsafe conditions at the Farmer's Market were more severe in degree than those at the Grove Street School, he did, however, state that many of the unsafe conditions at the Farmer's Market were "identical" to the conditions at the Grove Street School. He noted that both properties are located in the Industrial and Commercial Buildings District. According to Anderson, among other similarities, both buildings were used by vagrants; both presented a fire hazard; both had been damaged by freeze and thaw cycles; and both had been compromised, in some way, in their structural integrity.
Despite these similarities, Anderson has chosen not to take the same course of action with the Grove Street School as he did with the Farmer's Market. He admittedly conducted a detailed investigation of the Farmer's Market before ordering its demolition, visiting the property several times and reviewing a study prepared by the building's owners. Since his cursory visit to the Grove Street School in July 2007, Anderson has not even entered the interior of the building, despite a suggestion by this Court upon reopening the record that he do so. On his last visit to the Grove Street School in January 2008, Anderson inspected only the exterior of the building, observing that one of the rear basement windows had been "knocked open" and reporting this fact to counsel for the City. Tr. VI at 8. Additionally, Anderson has neither read nor sought the report on the Grove Street School's structural integrity by Defendants' expert, Gerald Vezina. Id. at 69.
According to Anderson, in his judgment, the difference in size made the Farmer's Market more difficult to secure from trespassers, who might be injured by the condition of the building.[10] The overwhelming evidence in the record discredits this distinction as justification *Page 29 
for not ordering immediate demolition.[11] The distinction does not make logical sense either. Although the Farmer's Market is larger than the Grove Street School, unlike the Farmer's Market it is located in a compact residential area, immediately adjacent to the sidewalk and the street. In a residential area, trespassers — especially children — may be more likely to attempt entry and an uncontrolled fire could put more people at risk. Furthermore, the Court notes that parcel size is not an explicit consideration in any of the statutory criteria previously discussed.
Anderson also testified that two factors having nothing to do with the condition of the Grove Street School underlie his decision, for the present time, not to declare the Grove Street School "unsafe" or "hazardous." First, Anderson has stated his wish to avoid interference with this litigation. Asked whether he would declare the Grove Street School "hazardous or unsafe" in the absence of this litigation, Anderson responded: "I would have to say yes." Transcript, Feb. 4, 2008 (Tr.VI) at 69. Second, Anderson agreed with the Court that the reason he had not ordered demolition of the Grove Street School was so as not to reward Defendants for attempting demolition without a permit. Anderson told the Court: "What I see is a building owner who has illegally knocked down part of his building, and now he is looking to come to the City to bail him out." Id. at 27.
Even if well-intentioned, Anderson's actions fall below the threshold statutory level which is required of him as a building official. Pursuant to the above provisions of the state building code, if "any one" of the criteria for an "unsafe" building is met, then the building "shall be declared unsafe by the building official." See § 23-27.3-124.1
(emphasis added). Anderson *Page 30 
has acknowledged that the Grove Street School is "unsafe," yet has failed to declare it as such or take any steps beyond merely observing its condition.[12] See Hamlet Hospital, 68 S.E.2d at 868 (recognizing where discretion as to existence of facts is required and those facts are clearly proven or admitted, act becomes ministerial); see also ShellOil Co. v. City of Chicago, 292 N.E.2d 84, 87 (Ill.App. 1972) (finding official cannot arbitrarily refuse to exercise discretion to act upon certain set of facts). Consequently, Anderson's duty to formally declare the Grove Street School "unsafe" was one of a ministerial character.
The state building code further provides that, after declaring a building "unsafe" the building official "shall issue . . . an order either requiring that the building . . . be made safe or be demolished within a reasonable, stipulated time." See § 23-27.3-124.2 (emphasis added). As observed, supra, the term "shall" establishes a presumption that the Legislature's intent was mandatory. See also Beacon,103 R.I. 698, 703 (R.I. 1968) (construing "shall" in "an imperative sense" and issuing a writ of mandamus).[13] Furthermore, by its own terms, the state building *Page 31 
code stipulates that it should "be construed to secure its expressed intent which is to insure public health, safety, and welfare. . . ."See § 23-27.3-100.3. It would be illogical to construe this code to give a building official discretion to determine that a building ought to be declared "unsafe" without requiring some type of action. Such an interpretation of the building code would expose the public to the most severe safety risks as judged by the public officials with the most expertise.[14] See Laplante v. Honda N. Am., 697 A.2d 625, 628 (R.I. 1997) (stating court should "adopt a construction that avoids an absurd or unjust result.").
Although § 23-27.3-124.2 grants a building official discretion with respect to his or her action — to order that an "unsafe" building either be "made safe" or "be demolished" — in this case, Anderson's own admissions mandate demolition. "[I]n circumstances in which a clear abuse of discretion is evident . . . mandamus may be proper even where the duty in question is purely discretionary." Id. at 26 (citingMcLyman, ex rel. Hogan v. Holt, 51 R.I. 96, 98, 151 A. 1, 2 (1930));see also Ponder v. Joslin, 138 S.E.2d 143, 149 (N.C. 1964). Such an exercise "may not be so boundless and uncontrolled so as to allow the official to negate and nullify a statutorily established system."Adler, 623 A.2d at 26 (citations omitted); see also Alger v. Dep't ofLabor Industry, 917 A.2d 508, 516-19 (Vt. 2006) (suggesting failure to implement building code is an abuse of discretion permitting mandamus);Fandrich v. Wells County Bd. of County Comm'rs, 2000 ND 181, P7,618 N.W.2d 166, 170 (N.D. 2000) (stating discretion must be based on "rational mental process"); City of Hialeah v. Florida, 97 So. 2d 198,199 (Fl.App. 1957) (characterizing decision prompted by bias or political reasons as arbitrary, capricious, and abuse of discretion). Consequently, "where an official arbitrarily refuses to exercise any discretion at *Page 32 
all," a court may circumvent the general rule that normally prevents it from controlling an act of judgment or discretion through a writ of mandamus. See Piller v. Village of Beecher, 381 N.E.2d 1209, 1210
(Ill.App. 1978); see also Corcoran v. Village of Bennington, 266 A.2d 457,463 (Vt. 1970) (concluding refusal to act supports resort to mandamus);Hamlet Hospital, 68 S.E.2d at 868 (reiterating control of a discretionary act is permitted via mandamus where discretion has been abused).
Anderson, a building official charged with ensuring the structural integrity of the City's buildings, openly stated that he did not take any action with respect to the Grove Street School in the hope of permitting this Court to decide its fate without interference.[15] In addition, Anderson implicitly concluded that ordering demolition of the building would, in essence, "reward" the Tarros for their earlier demolition attempts, even though the demolition could have taken place without regard to the permitting process if Anderson had exercised discretion to order that particular action. In this case, Anderson not only failed to act, thereby indicating a decision-making process that was neither rational, nor exhibited any indicia of discretion, but he also failed to act within the bounds of his own professional judgment.See Berkeley Unified Sch. Dist of Alameda County v. City ofBerkeley, 297 P.2d 710, 712 (Cal.Ct.App. 1956) (commenting mandamus compels acts to be done by officers who refuse to perform because of an erroneous conception of his duties); see Jackson County v. EarthResources, Inc., 627 S.E. 2d 569, 571 (Ga. 2006) (opining mandamus proper "where there has been a gross abuse of discretion"). His inattention to conditions at the Grove Street School has been deliberate and disturbing. This Court characterizes this behavior, in light of Anderson's own expert opinion *Page 33 
that the building was, at a minimum, "unsafe," as a clear abuse of discretion.[16] See Adler, 623 A.2d at 26 (agreeing that "mandamus should issue when there is an abuse of discretion").
 C No Adequate Remedy at Law
Before mandamus will issue, this Court must find that the Tarros have "no adequate remedy at law." Therefore, to bar mandamus, another available remedy "must be one which is plain, speedy and adequate."Warren Education Ass'n v. Lapan, 103 R.I. 163, 174, 235 A.2d 866, 873
(1967). Whether this type of remedy exists is "a question of fact determinable by the court from the circumstances." 17 MunicipalCorporations § 51:9 (citing River Park Square, L.L.C. v. Miggins,17 P.3d 1178, 1182 (2001)); see also State ex rel. Pierce v. Slusher, 244 P. 540, 541 (Or. 1926) (stating "[e]very proceeding in mandamus must be determined upon its own setting of facts"); Warren Education Ass'n,103 R.I. at 175, 235 A.2d at 873 (stating "[t]he question of what constitutes a plain, adequate and speedy remedy is not susceptible to application as a general rule but instead must be considered in the circumstances of each case").
This Court is mindful that "[t]he existence of unexhausted administrative remedies may serve to prevent the issuance of a writ of mandamus." New England Development, LLC v. Berg, 913 A.2d 363, 369 (R.I. 2007). However, this Court also acknowledges that "[a] writ may issue even where other remedies exist, if they are not sufficiently speedy to prevent material injury[.]" State ex rel. Pierce, 244 P.2d at 541. Furthermore, "it is the inadequacy, not the mere absence, of all other legal remedies, and the danger of a failure of justice without it, that generally *Page 34 
determines the propriety of the issuance of a writ of mandamus."State ex rel. Pierce, 244 P.2d at 541.
As the City argues, Defendants still have the possibility of obtaining the desired result — demolition of the Grove Street School — by applying to the HDC for a certificate of appropriateness to complete their application. Defendants seemingly have not exhausted their administrative remedies. The Court further observes that the state building code, pursuant to § 23-27.3-127.1(b)(1), permits any "aggrieved party" to appeal a decision or failure to act by the building commissioner to the state building code board of standards and appeals. An "aggrieved party" includes "[a]n owner of the building or structure which is subject to any . . . failure to act by a local building official. . . ." Section 23-27.3-127.1.
However, despite the existence of unexhausted administrative remedies, mandamus remains appropriate in this matter to compel the acting building official to act upon his determination that the Grove Street School is "unsafe." "If the remedy provided is one that is not plain, speedy, and adequate, mandamus may lie." Wood, 416 A.2d at 692. One situation in which a remedy at law is inadequate is where a party can demonstrate "irreparable harm." See Barngrover v. Fourth JudicialDistrict, 979 P.2d 216, 220 (Nev. 1999) (entertaining petition for writ where "circumstances reveal urgency and strong necessity" in criminal matter) Rhode Island Turnpike Bridge Auth. v. Cohen, 433 A.2d 179, 182
(R.I. 1981) (discussing inadequacy of other remedies in relation to "irreparable harm" in context of injunctive relief). "Irreparable harm" encompasses situations in which public health and safety are at risk.See Barngrover, 979 P.2d at 220 (stating writ of mandamus, although an extraordinary remedy, may be available "to prevent irreparable harm") (citing Clark County Liquor v. Clark, 730 P.2d 443, 447 (1986)). *Page 35 
Subjecting this matter to an administrative process would exacerbate rather than remedy the current safety issues taking into account both the time required for the Defendants to exhaust their administrative remedies and the condition of the Grove Street School. See Wood,416 A.2d at 692 (determining "question of what constitutes a plain, speedy, and adequate remedy must be considered in the circumstances of each case"). The difficulty in securing the building from trespassers, the unstable condition of the floors, the location of the building in a compact residential neighborhood, and the risk of fire — as evidenced by the fire that broke out in July — all convince the Court that it would be reckless to permit conditions to remain as they are for the foreseeable future.
If Defendants were to apply immediately for a certificate of appropriateness, the HDC would have up to 90 days to "act."See Providence Zoning Ordinance § 501.7. If the HDC made a decision adverse to Defendants, they could appeal to the Providence Zoning Board of Review and thereafter to the Rhode Island Supreme Court.Id. at § 501.12. The Court finds it unlikely that either the HDC or the Providence Zoning Board of Review would grant Defendants a certificate of appropriateness, given how strongly the City has already opposed Defendants in this matter and the harsh, illogical nature of the City's initial request that the Defendants rebuild the demolished portion of the building and then apply for a demolition permit.[17] Although the Court cannot predict the length or result of any appeal to the state building code board of standards and appeals, it would certainly take months, if not more than a year, before Defendants could exhaust all of their administrative remedies. *Page 36 
Furthermore, the state building code requires the owner of an "unsafe" building to begin abating any unsafe conditions within 30 days of receiving a notice from the building official. See § 23-27.3-124.4.1. Section 23-27.3-124.4.1, in setting a time limit for beginning restoration work, specifically provides that the work must begin "within thirty (30) days of the receipt of the notice of an unsafecondition." (Emphasis added). It also provides that "the work shall continue until "the unsafe condition has been abated." The plain language of this provision indicates that an order to restore a building is only for circumstances in which a single — or at most several — unsafe conditions exist. Having agreed that eleven unsafe conditions exist, Anderson may not order all of them to be addressed at once; this result would be largely inequitable to the Tarros.
Because mandamus is an extraordinary remedy, even after all the elements of mandamus are met, it is ultimately "within the discretion of the Superior Court justice" whether to issue the writ. Berg,913 A.2d at 368 (citing Martone v. Johnston School Committee, 824 A.2d 426, 429
(R.I. 2003)). The Court is here confronted with highly unusual and extraordinary circumstances.
The state building code requires building owners to maintain their buildings "in a safe and sound condition at all times." Section23-27.3-124.0. Certainly, the Tarros bear much of the responsibility for permitting the Grove Street School to fall into its current condition — even if they thought that they had a continuing right to demolish it. However, the City is equally culpable for not enforcing the state building code. See § 23-27.3-108.1 (iterating local building official "shall enforce all the provisions of this code"); see also Alger,917 A.2d at 320-21 (highlighting possibility of mandamus where department fails to enforce building code, thereby characterizing inaction as abuse of discretion). If the City desired rehabilitation, it had a duty under the state building code to compel the Tarros — by legal action if necessary — to commence that work as conditions arose. See §23-27.3-124.5 (requiring legal counsel of municipality to *Page 37 
institute legal action when a building owner disregards an "unsafe" notice). It failed to do so. The unexplained and arbitrary action — or inaction — of the City's past and present building officials has permitted an unsafe and hazardous building to remain standing in a densely populated residential neighborhood for more than 25 years. The Court is convinced that the Grove Street School is putting the public safety at risk every day it remains standing. See Camara v. MunicipalCourt of San Francisco, 387 U.S. 523, 537 (1967) (acknowledging the "public interest demands that all dangerous [building] conditions be prevented or abated"). The Court finds that Anderson, the acting building official, has refused to take any action with respect to the subject property after concluding it is unsafe or hazardous.[18] There is no credible reason supporting Anderson's decision not to order demolition of the Grove Street School in the interest of public safety. His conscious disregard of his responsibility in this case cannot be condoned.
Accordingly, this Court finds that the most equitable resolution to this long-standing dispute is ordering a writ of mandamus to provide for the demolition of the Grove Street School. This Court hereby grants Defendants' counterclaim for a writ of mandamus ordering Anderson to issue Defendants a demolition permit.[19] *Page 38 
 V Fines, Costs, and Attorney's Fees
As the Court noted at the outset of its decision, the Tarros and the City share responsibility for the present predicament. The evidence clearly establishes that Defendants commenced demolition without a permit. The penalty for violating the state building code with respect to this activity entails a fine of $500 per day for each day during which any portion of a violation occurs. See § 23-27.3-122.3. Beginning on January 29, 2007, the Tarros began preparing the Grove Street School for demolition; they were halted on February 3, 2007, after completing a partial demolition of the building using the services of Bilray.
Accordingly, the Court orders the Tarros to pay a fine of $3000 to the City, which constitutes the aggregate fine for the six-day period during which violations of the building code occurred. The Tarros shall also compensate the City $1,868.98, which reflects the cost to the City of 24-hour police surveillance of the Grove Street School in the days following its attempted demolition.
Due to a lack of evidence that the Defendants received proper notice regarding a stop-work order issued by the City, the Court declines to assess a fine for the order's alleged violation. Accordingly, the Defendants shall pay the City a total of $4,868.98.[20] *Page 39 
Each party also seeks attorney's fees resulting from their participation in this matter. Specifically, the City asks this Court to require Defendants to pay legal fees accrued by it through the course of this litigation. The City claims that the Tarros' attempted demolition of the Grove Street School constituted a bad faith, willful violation of law.[21]
"The rule * * * has long been that [attorneys'] fees are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor[e]." Mullowney v. Masopust, No. 2007-34-Appeal, slip op. at 10 n. 6 (R.I., filed Mar. 18, 2008) (citation omitted); see also Mello v. DaLomba, 798 A.2d 405, 410 (R.I. 2002). However, the Court may, in "exercising its inherent power to fashion an appropriate remedy that would serve the ends of justice in this controversy[,]" award counsel fees and expenses. Vincent v. Musone,574 A.2d 1234, 1235 (R.I. 1990).
Absent from the state building code is any provision relating to the recovery of attorney's fees for a municipality's prosecution of actions against an offender of that code. Moreover, although the City prevailed in its attempt to obtain fines from Defendant, it has been ordered by writ of mandamus to act with respect to the Grove Street School based on Defendants' counterclaim. Because the City's claim with respect to unauthorized demolition and Defendants' counterclaim seeking a writ of mandamus were both meritorious, the City's request for attorney's fees is denied. Additionally, the unique factual circumstances of this case served to *Page 40 
relinquish any willingness on the part of the Court to award attorney's fees to the City in this matter.
 VI Conclusion
This Court acknowledges that all property owners have a right to expect that municipal officials will exert good faith efforts to consistently apply governing legal principles to a given situation. As a result, these owners have a right to expect that an official's examination of buildings in disrepair — sharing substantially similar characteristics of deterioration and danger and which are evaluated pursuant to a single statutory scheme — will yield the same results.
"Equity is a flexible concept which involves rejection of rigid rules to accomplish what is fair and just in a particular situation." In reMarket, 142 B.R. 734, 742 (1992). In balancing equities, the Court may tailor relief to suit the circumstances of the case before it.See 1 Dan B. Dobbs, Law of Remedies § 2.4(1) (2d ed. 1993); see alsoWheeling Steel Corp. v. Amer. Rolling Mill Co., 92 F.2d 97, 100 (6th Cir. 1936). Mindful of the extraordinary nature of a writ of mandamus, and respectful of Rhode Island's building code, this Court orders that the City of Providence issue a demolition permit to the Tarros in order to protect the public from the unsafe or hazardous conditions resulting from 25 years of neglect by the parties to this lawsuit. Further, this Court requires that the Tarros remit the sum of $4,868.98 in fines and costs to the City, resulting from Defendants' previous attempted demolition of the Grove Street School. Counsel shall submit the appropriate judgment for entry.
[1] At the meeting, a resident of Grove Street expressed his view that the majority of neighborhood residents favored Tarro's plan to demolish the building in the belief that alternative plans to converting the building into apartments would create too much congestion in the area. A City Councilman also mentioned complaints regarding children entering the school as well as that the Police and Fire Departments were often called to the school.
[2] La Terra Bellina's testimony forms almost the entire basis of the Court's understanding of the events surrounding Stephen Tarro's application for a demolition permit in 2004. Stephen Tarro passed away in 2007. Surprisingly, the two City officials who testified — Edgar Paxon and Olayinka Oredugba — could not recall anything regarding the application or their own involvement in the relevant events.
[3] In its original Complaint, the City requested immediate restoration of the Grove Street School to its condition prior to February 3, 2007, the date of the attempted demolition.
[4] Pursuant to § 23-27.3-123.1.1, "[a] stop-work notice shall be posted in a conspicuous place on the job site and shall be removed only at the direction of the building official."
[5] The only verbal order to stop work of which the Court has knowledge is the order given to Bilray on February 3, 2007 to cease demolition. Bilray complied with this order after demolishing an additional portion of the building at the request of the acting building official.
[6] The City asserts other reasons for not enforcing any agreement between Richard E. Tarro and the City. For instance, the City asserts that the contract may not be enforced because it was an oral contract for the sale of land barred by the statute of frauds, see R.W.P.Concessions v. Rhode Island Zoological Soc'y, 487 A.2d 129, 130 (R.I. 1985), and because the 10-year statute of limitations has expired pursuant to G.L. 1956 § 9-1-13. The City cites other doctrines which customarily bar the enforcement of contracts, including unclean hands, laches, and waiver. The Court finds it unnecessary to reach these arguments.
[7] The Court can only speculate on what would have happened had Tarro or a member of his family received the mailed notice. Assuming the Tarros were unaware of the proposed designation, the notice may have prompted them to persuade the City that, due to the original sales agreement, it would not be equitable to designate the building as historic.
[8] This matter is factually distinguishable from an instance in which a party is seeking a writ to compel an inspection of property for possible building or zoning code violations. See Centrust Savings Bankv. City of Miami, 491 So. 2d 576, 577 (Fla.Ct.App. 1986) (finding inspections do not constitute performance of ministerial duty for which writ is available). Here, the Court examines a request for action upon a particular finding of the building official post-inspection.
[9] For example, with respect to "unsafe" conditions, the building official must make a judgment whether there has been a "hazardous accumulation" of dust and debris; whether a building would "constitute a fire or windstorm hazard"; or whether a building is an "attractive nuisance" for children.
[10] He offered the explanation that his decision to order demolition of the Farmer's Market, but not the Grove Street School, was due to the much larger size of the Farmer's Market. Anderson testified that the school had a building footprint of 8720 square feet and a lot size of 16,000 square feet while the Farmer's Market is comprised of 75,420 square feet with a 174,575 square feet lot size.
[11] In addition, Anderson acknowledged that the ability to secure a property depends not only on the property's size, but also on the knowledge, experience, and financial resources of the owner. In the case of the Farmer's Market, its owner was one of the largest and most experienced real estate developers in the state. This fact further lessens Anderson's credibility.
[12] The Court here acknowledges its receipt of a letter, dated March 27, 2008, sent from Kerry Anderson to the Tarros and Bilray, and on which this Court was copied. The letter received by the Court on April 3, 2008, described Anderson's opinion of the Grove Street School after dispatching an inspector from his department to examine the property on March 4, 2008. Anderson stated that 11 unsafe conditions exist at the property, and pursuant to § 23-27.3-124.2, ordered the owners "to make the building / site safe" and to "board up all openings in the building, make the building weather tight and install a 6' chain link fence where necessary to discourage trespassers immediately." (Emphasis in original.) The letter further stated that the Grove Street School would be inspected for compliance with Anderson's order on April 7, 2008.
This Court is left to ponder why Mr. Anderson — after the record in this matter has been closed for nearly two months, after he stated that he "did not want to get involved [by seeking access to the interior of the school] to a point that [a]ffected, unduly [a]ffected this case,"Tr. VI at 38, and most importantly, upon the eve of the release of this Decision — only now has chosen to exercise his right and duty under § 23-27.3-124.1 to examine the Grove Street School and declare that it is unsafe, and order the owners to secure the property. His indifference toward this matter is troubling and further diminishes his credibility before this Court. This eleventh hour attempt to monitor the property's condition demonstrates Anderson's lack of good faith and diligence in tending to a matter that has long been a threat to the public safety. As such, his actions do not change the Court's findings and conclusions regarding the Grove Street School.
[13] Moreover, as to "hazardous" buildings, the state building code uses permissive language, "may," to suggest that demolition remains within the discretion of the building official. See § 23-27.3-125.5. The use of the permissive term "may" with respect to "hazardous" buildings in juxtaposition with the term "shall" with respect to "unsafe" buildings creates an inference that each term was intended to carry its ordinary meaning. See 3 Norman J. Singer, Sutherland on Statutes andStatutory Construction § 57:11 at 40 (6th ed. 2001) ("Where both mandatory and directory verbs are used in the same statute . . . it is a fair inference that the legislature realized the difference in meaning, and intended that the verbs used should carry with them their ordinary meanings.")
[14] The Court, likewise, does not believe a building official could determine a building to be "hazardous" and fail to take any action. A building official's discretion, pursuant to § 23-27.3-125.5, can best be read as discretion to determine whether a building can be defined as "hazardous."
[15] This action is unlike the situation presented in South EndEnterprises, Inc. v. City of York, 913 A.2d 354, 359 (Pa. Commonw. Ct. 2006), where the building inspector vacated, boarded up, and ordered demolition of a dangerous building. In that case, mandamus was not necessary. Plaintiffs were not entitled to such an extraordinary remedy because their concerns related solely to the manner in which discretion was exercised by the building inspector to remedy unsafe conditions, not his failure to respond to those conditions at all. Id. at 360.
[16] If Anderson were to declare that the Grove Street School be "made safe" he ostensibly would be requiring the Tarros to restore it to a "safe and usable condition." See § 23-27.3-124.4 ("A building, sign, or structure declared unsafe by the building official shall be restored to a safe and usable condition. . . ."); § 23-27.3-124.4.1 (owner of unsafe building must begin "restoration or reconstruction" within 30 days of receipt of unsafe notice). However, the state building code does not permit a building official to order restoration in situations where a building is in an advanced state of disrepair or where the costs of restoration are economically prohibitive.
[17] The Court does not make a determination as to whether the process of seeking a certificate of appropriateness from Providence authorities would be futile, which would provide another basis for the inadequacy of the administrative remedies. See Cullen v. Town Council, 850 A.2d 900,906 (R.I. 2004) (futility established where "permitting authority has made it `transparently clear' that a permit application will not be granted") (quoting Gilbert v. Cambridge, 932 F.2d 51, 61 (1st Cir. 1991)); see also Marran v. West Warwick Sch. Comm., 113 R.I. 42, 45
(R.I. 1974) (for a remedy to be futile, "an adverse decision [must] be certain at all levels of the prescribed administrative review").
[18] See supra note 12 (describing Anderson's recent, yet belated activities with respect to the Grove Street School).
[19] The Court recognizes that Kerry Anderson, the acting building official, has not been made a party to this action. Instead, Defendants have filed a counterclaim seeking a writ of mandamus against the City, the only named plaintiff in this action. All parties involved had been given notice of Defendants' counterclaim. In fact, Anderson appeared during trial to provide testimony. The City has not challenged the propriety of Defendants' action with respect to the party against whom Defendants seek mandamus.
"In Rhode Island the local building official is a municipal administrative officer who is bound to follow the . . . applicable statutory provisions pursuant to which he or she is authorized to act."Pitocco v. Harrington, 707 A.2d 692, 696 (R.I. 1998); see also §23-27.3-107.1 (requiring local building official to administer state building code within municipality); § 23-27.3-108.1 (requiring local building official to enforce code as well as other applicable statutes, rules, regulations, and municipal ordinances). Section 23-27.3-107.9
relieves a local building official from personal liability for activities conducted in the discharge of his official duties; it further provides that any suits initiated against a local officer shall be defended by the legal representative of the municipality. Because the City, through a building official serving as its agent or employee, is the authority which issues permits, Defendants' failure to name all interested parties does not deprive this Court of jurisdiction over the building official. See State ex. Rel. Kugler v. City of MarylandHeights, 817 S.W.2d 931, 932 (Mo.App. 1991). A counterclaim against the City to rectify a particular action or inaction of one of its officials includes the possibility that this Court might require that the particular officer, acting on behalf of the City, perform certain duties. Consequently, Anderson's involvement in this action as a municipal administrative officer supports this order. See Town ofJohnston v. Pezza, 723 A.2d 278, 284-85 (R.I. 1999) (recognizing town may revoke permit through building official and reinstating such official's order although official not named party in action).
[20] This award does not consider the negligence count alleged by Plaintiff in its Amended Complaint. "Simply stating an issue for . . . review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue." Catucci v.Pacheco, 866 A.2d 509, 516 (R.I. 2005) (quoting Wilkinson v. State CrimeLaboratory Comm'n, 788 A.2d 1129, 1131 n. 1 (R.I. 2002)). Here, the City has simply asserted Defendants' negligence without a meaningful discussion or legal briefing to substantiate their claims. The City did not address this count either in its supporting memoranda or during arguments before this Court, so this Court will not address the merits of said claim.
[21] The Tarros also charge Bilray, as an independent contractor, with the failure to obtain necessary approvals prior to commencing demolition. Therefore, the Tarros urge that to the extent Bilray failed to obtain a necessary permit, Bilray must indemnify them for any fines assessed by this Court, as well as counsel fees incurred while defending the claims brought by the City. Bilray also asks that it be awarded attorney's fees from the Tarros for defending this matter; Bilray insists that Stephen and Patricia Tarro agreed to indemnify it, and it relied on a certificate of appropriateness produced by Stephen Tarro prior to commencing demolition.
This Court declines to address these issues at this time. At the outset of this litigation, the Court indicated that its determination and adjudication of any claims for indemnification between Bilray and the Tarros would be reserved until the action between the City and the Tarros had concluded. The Court also noted that if necessary, Bilray's claims and the factual underpinnings relating to the legal relationship between the parties would be addressed subsequent to the final disposition of the instant matter. *Page 1